CATERPILLAR INC., Petitioner,

v.

OCCUPATIONAL SAFETY AND
HEALTH REVIEW COMMIS-
SION, Respondent,

United Auto Workers, Local 974,
Intervening–Respondent.

No. 96–3668.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1997.

Decided Aug. 21, 1997.

John F. Kuenstler, Wildman, Harrold, Allen & Dixon, Chicago, IL, Robert E. Mann (argued), Sally J. Scott, Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Petitioner.

Jerome Schur, Katz, Friedman, Schur & Eagle, Chicago, IL, Barbara Werthmann, Department of Labor, Occupational Safety Health Review, Washington, DC, Charles F. James (argued), Department of Labor, Office of the Solicitor, Washington, DC, Ray Darling, Jr., Occupational Safety & Health Review Commission, Washington, DC, for Respondent Occupational Safety and Health Review Commission.

Barbara Werthmann, Department of Labor, Occupational Safety Health Review, Washington, DC, Charles F. James (argued), Department of Labor, Office of the Solicitor, Washington, DC, for Respondent Reich.

Jerome Schur, Katz, Friedman, Schur & Eagle, Chicago, IL, for Intervenor–Respondent United Auto Workers, Local 974.

Before CUMMINGS, WOOD, JR., and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioner Caterpillar Inc. ("Caterpillar") appeals a final decision of the Occupational Safety and Health Review Commission (the "Commission") issued September 4, 1996. This case arises out of an accident at Caterpillar's East Peoria, Illinois, facility involving the repair of a 6,000–ton forging press called the Erie 6000. The repair procedure required use of a gear pulling device that had four steel studs on it, each weighing 35 to 40 pounds and measuring 42 inches in length and 1 3/4 inches in diameter. The accident occurred when a steel stud broke off during the repair operation and was propelled 121 feet, where it hit an employee in the head, causing serious injury.

After the accident, the Secretary issued a citation alleging that Caterpillar willfully violated Section 5(a)(1), 29 U.S.C. § 654(a)(1)—the "general duty clause"—of the Occupational Safety and Health Act of 1970 (the "Act"), 29 U.S.C. § 651 et seq. The Administrative Law Judge (the "ALJ") assigned to the case affirmed the citation and assessed a penalty of $30,000. The Commission agreed with the ALJ that Caterpillar's violation of Section 5(a)(1) was willful, but concluded that a penalty of $49,000, the amount originally requested by the Secretary, was appropriate.

This Court has jurisdiction over the appeal pursuant to Section 11(a) of the Act, 29 U.S.C. § 660(a).

## Facts; Standard of Review

At issue in this case is a citation issued on or about January 13, 1993, by the Occupational Safety and Health Administration ("OSHA"). The citation alleged a violation of Section 5(a)(1) of the Act in that:

> On or about July 16, 1992, in building BB at the Erie 6,000 ton forging press, employees were exposed to the hazard of being struck by broken parts thrown through the air during maintenance procedures. The equipment, including the studs, as used in an attempt to pull the Erie 6,000 ton press's clutch hub off of its shaft, did not have a safety factor of four-to-one[1] and the equipment was neither guarded nor retained.

In July 1992, a bearing failed on the hub of the Erie 6000, a 6,000–ton forging press

---

1. The "four-to-one factor" argument was not argued before the ALJ, the Commission or this Court and has accordingly been abandoned.

that forges the track links of earthmoving equipment. As a result, the hub had to be removed from its crank shaft so that new bearings could be inserted, and Caterpillar scheduled this maintenance procedure for July 15, 1992, during a previously planned production shutdown. Prior to the operation, Ronald Williams, the day shift's lead repairman, met with his supervisor of three months, James Rhodes. As discussed below, prior to this time, Williams had held detailed discussions with his previous supervisor about his safety concerns regarding this type of operation and had made multiple suggestions regarding possible safety precautions. During his meeting with Rhodes, however, Williams suggested only that warning signs be posted and the area be cordoned off. Rhodes agreed and took care of the matter.

To remove the hub, Williams and two coworkers assembled a gear pulling device, which consisted in part of four steel studs screwed into the face of the hub, two on each side. Using two large hydraulic jacks, an outward pressure was placed against the hub. As had happened in the past with this type of assembled gear puller, when a high degree of pressure was placed on the steel bars spanning the area across the face of the crank shaft between the paired studs uneven pressure could cause the studs to bend or break.

The operation at issue in this case began during the night shift on July 15, 1992. That crew did not successfully remove the hub and quit after a stud snapped and a fragment flew 25 feet. Richard Hill, the night-shift supervisor, was in the vicinity and was aware of the broken stud and had observed studs break during maintenance operations on another forging press. Hill told Rhodes about the stud break, but Williams, the worker in charge of the pull, was not advised. The next day when Williams began preparing for the pull, he noticed that the area in front of the Erie 6000 was not "taped off" even though warning tape had been placed 40 to 60 feet away from the sides of the press, so he and Rhodes moved the warning tape to a distance of 90 to 100 feet away from the press on all sides. Williams warned Cater-

pillar employees Bonner and Dunn, who were performing unrelated work, that the operation was about to begin, and the men moved out of the way. However, when the crew began the pulling procedure, one of the studs broke, and the fragment, which weighed over nine pounds, flew 121 feet through the air. It struck Dunn in the back of the head, causing serious injury.

This was not the first experience Caterpillar had had with flying studs. In the Spring of 1989, Williams and a crew removed the hub on the Erie 6000 press in order to fix the brake wheel. During the process one of the studs broke and a fragment flew 60 feet through the air, stopping finally when it hit a heavy metal cabinet. The force of the impact indented the cabinet three inches. Both maintenance foreman Clay Parker (Williams's supervisor prior to Rhodes) and the shop superintendent, Darrel Seeyle, were aware of the incident. The stud came within 20–25 feet of hitting Seeyle.

During a July 1989 pull, the crew removed the hub from the other side of the Erie 6000 press, with Williams again acting as leadman. Eight to ten studs broke and flew during this procedure, one of the studs flying 35 to 40 feet and leaving a half-inch dent in the metal of a crane (co-incidentally, it was the accident victim in 1992, Dunn, who narrowly escaped injury from this stud).[2]

As a result of these experiences, Williams had repeatedly requested, and repeatedly been denied, enhanced safety precautions. At various times, Williams suggested the use of: (i) a "furnace curtain," which was rejected by Parker as too expensive and time consuming; (ii) tapered studs, which were also rejected by Parker after one use as too expensive and time consuming; (iii) an "H-beam fixture," which was discussed with other employees, including a mechanical technician who was a member of management, but nothing came of the idea; and (iv) a "bridge" device of several pieces of plate welded together with bracing, which Parker rejected without comment.

■ This Court's review of the Commission's order is limited to a determination

2. During 1991, the hub of the Erie 6000 was removed without incident.

whether the factual basis of the Commission's decision is based upon substantial evidence and whether the legal basis for the decision is arbitrary or capricious and in accordance with law. Administrative Procedure Act, 5 U.S.C. § 706. Caterpillar's primary argument on appeal is that it took precautions commensurate with the foreseen hazards of the Erie 6000 operation by assigning the project to a skilled and experienced tradesman (Williams) with a positive safety record. It states the issue as being "whether an employer may rely on its assignment of a complicated and potentially hazardous skilled-trades level task to a skilled trades-trained employee, as a method of meeting the employer's obligations" under the general duty clause (Br. at 2). Caterpillar urges us to find that the Commission's decision was arbitrary and capricious and departed from prior Commission precedent and the applicable statutory scheme.

**The Commission's finding that Caterpillar's violation of the general duty clause was willful is fully supported by Commission precedent and is not arbitrary or capricious**

 The Act's "general duty" clause provides that each employer:

shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

29 U.S.C. § 654(a)(1). Commission precedent clearly establishes that a general duty clause violation requires the following elements: (i) the existence of a hazard likely to cause death or serious physical harm; (ii) the employer's recognition (*i.e.*, awareness) of the hazard; (iii) the availability of feasible means to abate the hazard; and (iv) the employer's failure to implement the feasible means of abatement. See *Secretary of Labor v. Kastalon, Inc.*, 1986 WL 53514, *4 (O.S.H.R.C.). Of these factors, at issue in this appeal is, first, whether Caterpillar was aware of the hazard of studs shooting into the workplace during the type of maintenance procedure on the Erie 6000 that took place in July 1992, and, second, whether Cat-

erpillar failed to implement a feasible means of abatement. An OSHA violation is willful if it is committed with intentional disregard of, or plain indifference to, the requirements of the statute. See *Valdak Corp. v. O.S.H.R.C.*, 73 F.3d 1466, 1468 (8th Cir.1996); *Ensign–Bickford Co. v. O.S.H.R.C.*, 717 F.2d 1419, 1422 (D.C.Cir.1983), *certiorari denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (collecting cases). A willful violation "is differentiated from other types of violations by a heightened awareness—of the illegality of the conduct or conditions—and by a state of mind-conscious disregard or plain indifference." *Secretary of Labor v. Calang Corp.*, 1990 WL 140086, *2 (O.S.H.R.C.) (citations omitted).

The Commission's finding of willfulness was based on its conclusion that, in accordance with "well settled" principles of agency law, an employer is imputed with its supervisor's knowledge of a hazardous condition, even if the supervisor subsequently departs the employ of the employer, citing *Tampa Shipyards, Inc.*, 1992 WL 52938, *6 (O.S.H.R.C.), and *Acme Precision Products, Inc. v. American Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir.1970). See *Secretary of Labor v. Caterpillar, Inc.*, Decision of the Occupational Safety and Health Review Commission at 2–3 (O.S.H.R.C. No. 93373 Sept. 4, 1996) [hereinafter, the *Commission Decision*]. It found that Caterpillar was attempting to evade responsibility for its conduct by looking at the knowledge of Rhodes and its other new supervisory personnel in 1992, rather than looking back to the knowledge of the supervisors in place during the 1989 operations. In response, the Commission noted that it was Caterpillar's responsibility to disseminate to those entrusted with the health and safety of its employees the knowledge possessed by it regarding the "pervasive and continuing nature" of the flying stud problem. See *id.* at 3. In other words, it concluded that Caterpillar's "heightened awareness" of the problem remained with the corporation despite any turnover in personnel. See *id.* at 3–4.

After finding a "heightened awareness" of the problem, the Commission also concluded that Caterpillar showed a "plain indifference

to employee safety" when it simply delegated authority to Williams, "whose prior safety concerns it had rebuffed," again citing *Tampa Shipyards*. *Id.* at 4. It noted that Caterpillar had both knowledge of the hazard and abundant resources to evaluate and abate it and found that Caterpillar's installation of the tape barrier and warning signs for the procedure at issue were not an "objectively reasonable means of abatement, especially where employees involved in the hub-pulling procedure were located within it." *Id.* at 4–5.

Caterpillar claims that it took all steps required by the general duty clause when it put Williams, a skilled craftsman, in charge of the operation and relied on him to make appropriate safety recommendations to his supervisor, Rhodes. We agree with the Commission's analysis, however. The mere fact that Parker and Seeyle, who both indisputably were aware of the hazard, ceased to be Williams's supervisors before the 1992 pull does not cancel Caterpillar's knowledge (*i.e.*, heightened awareness) of the risks of the operations and its responsibility for their impact on Williams and the safety of the operation. See *Secretary of Labor v. Pride Oil Well Service*, 1992 WL 215112, *6 (O.S.H.R.C.); *Secretary of Labor v. A.P. O'Horo Co., Inc.*, 1991 WL 25318, *3–4 (O.S.H.R.C.). To hold otherwise would encourage corporate forgetfulness with possibly serious safety consequences. These supervisors consistently rejected Williams's recommendations for protecting workers from the flying studs. In light of these rejections, Caterpillar cannot now argue that it reasonably relied on Williams to ensure the safety of the hub pulling operation in 1992.

■ We also find that the Commission's conclusion that such reliance showed a plain indifference to employee safety—a prerequisite to a finding of willfulness—is supported by substantial evidence and Commission precedent and is neither arbitrary nor capricious. See *Ensign–Bickford*, 717 F.2d at 1422–1423; *Central Soya De Puerto Rico, Inc. v. Secretary of Labor*, 653 F.2d 38, 39–40 (1st Cir.1981); *Empire–Detroit Steel Division, Detroit Steel Corp. v. O.S.H.R.C.*, 579 F.2d 378, 385 (6th Cir.1978 ); *Tampa Shipyards*, 1992 WL 52938 at *8–10. The ALJ's findings of fact, as adopted by the Commission, demonstrate this. Caterpillar became aware as early as 1989 that when studs broke from the hub, fragments were propelled erratically in different directions and for different distances.[3] Despite this knowledge, and despite two incidents in which employees were nearly struck by flying fragments, Caterpillar rejected or ignored the recommendations of the very person it had put on the projects to eliminate the hazard. Williams had neither the power nor the authority independently to implement his rejected safety measures, nor could he commit Caterpillar resources to the measures. Caterpillar cannot now claim that it is not guilty of a willful violation because it put Williams in charge of the pull operation and relied on his expertise. The fact that Williams did not suggest additional safety measures during the July 1992 operation appears understandable given the rejection of his many suggestions over the preceding three years, and it does not excuse Caterpillar's failure to implement additional safety measures. After all, "[r]esponsibility under the Act for ensuring that employees do not put themselves into any unsafe position rests ultimately upon each employer, not the employees, and employers may not shift their responsibility onto their employees." *Secretary of Labor v. V.I.P. Structures, Inc.*, 1994 WL 362276, *3 (O.S.H.R.C.).

■ Good faith efforts at compliance that are incomplete or not entirely effective can negate a willfulness finding provided that they were objectively reasonable under the

---

**3.** Caterpillar emphasizes that certain structural changes were made to the Erie 6000 press after 1989 to avoid the "galling" that had caused the studs to break off during the 1989 pulling operation and that, as noted above, the hub of the Erie 6000 was removed without incident during 1991. However, on the evening of July 15, 1992, the night *before* Dunn was struck by a flying stud fragment, galling occurred while the crew was removing the hub, causing a stud to snap and a fragment to fly through the air, just as had happened during the 1989 operation. Rhodes was aware of the stud break that evening. It should have been obvious then, if not before, that whatever modifications had been made to the press were not sufficient to eliminate the risk of flying studs.

circumstances. See *Tampa Shipyards,* 1992 WL 52938 at *10. However, we agree with the Commission that in this case Caterpillar's decision in July 1992 to install warning tape and signs was not an objectively reasonable safety plan. As the Commission noted, the tape certainly offered no protection to employees working within the danger zone and Caterpillar had no way of knowing on July 16, 1992, that a 100–foot zone would be adequate, given that a previous stud had been shot out to 60 feet, stopping only when it slammed into a steel cabinet, leaving a three-inch dent (the safety zone of 40–60 feet on the sides only of the Erie 6000 on July 15, 1992, was without question inadequate).

Despite Caterpillar's urging, this Court's decision in *McLaughlin v. Union Oil Co. of California,* 869 F.2d 1039 (7th Cir.1989), does not lead to a contrary result. In that case, this Court found that the employer's failure to inspect a pressure vessel for microscopic hydrogen stress corrosion cracking was merely negligent and not "willful." However, the Court emphasized as part of its reasoning that there had never been a serious accident to such a pressure vessel by reason of hydrogen stress corrosion cracking. See *id.* at 1047. We believe the facts of this case are simply distinguishable: Caterpillar's failure to take reasonable safety precautions after it was actually aware from other near-accidents that flying stud fragments posed a danger is far different conduct than Union Oil's failure to discover microscopic cracking before any accident had resulted or visibly been threatened.

Likewise, Caterpillar puts much emphasis on the Commission's decision in *Secretary of Labor v. Connecticut Light & Power Co.,* 1989 WL 223325 (O.S.H.R.C.), wherein it stated that, "An employer is justified in placing a great deal of reliance on the judgment of highly experienced and trained employees with good safety records." *Id.* at *6. However, Caterpillar's selective quote miscomprehends the thrust of the Commission's decision in that case. Unlike Caterpillar in this case, Connecticut Light & Power had not put an employee in charge of ensuring other employees' safety. The Commission found that Connecticut Light & Power had not

violated the general duty clause because it had a very detailed safety protocol in place, which employees were expected to follow. It concluded that the Secretary had failed to meet her burden of proving the inadequacy of the safety program because she did not establish that the accident was the result of inadequate training or that more supervision by the foremen would have been both feasible and useful. It found instead that the employees involved in the accident were trained adequately to recognize the hazard posed by an energized lightning arrestor and that the company was justified in relying on those employees to discover the hazard and take proper precautions. *Id.* at *4–5.

Caterpillar's situation is completely different than that of Connecticut Light & Power. In this case, Caterpillar would like us to find that, because it "relied" on the expertise of Williams (while repeatedly rejecting or ignoring his recommendations), it did not violate the general duty clause. But, unlike Connecticut Light, it had no safety protocol in place and it had not trained Dunn, the accident victim, to recognize the hazard posed by flying studs. Unlike the injured Connecticut Light employee, who had been extensively briefed on safety issues, Dunn could not have been expected to take care of himself under the circumstances. Under Caterpillar's formulation, an employer would have almost no duty at all to its employees so long as it found one employee to take charge of a known, dangerous activity.

In light of the foregoing, the Commission's conclusion that Caterpillar willfully violated the Act's "general duty" clause is affirmed.

**The penalty was appropriate**

■ Penalties under the Act must take into account the size of the employer's business, the gravity of the violation, the good faith of the employer and the employer's history of previous violations. See 29 U.S.C. § 661(j). The Commission increased the penalty imposed by the ALJ, finding that Caterpillar was not entitled to credit for good faith, which the ALJ had given, reasoning that Caterpillar's violation had been willful and that abatement had been prompted only by the accident at issue and not done independently before anyone was hurt. See

Commission Decision at 6. After crediting Caterpillar only for its generally positive history with respect to previous violations, it determined that the proposed penalty of $49,000 was appropriate.

Caterpillar argues only that the Commission erred when it refused to give Caterpillar good faith credit, because Caterpillar co-operated in the accident investigation and immediately corrected identified hazards. It asserts that the Commission's theory is inconsistent with the policies of the Act and that the Commission's decision should be vacated, but it does so without citation to any legal authority that would lead us to agree.

■ This Court will not overturn the sanction imposed by the Commission unless it is unwarranted in law or without justification in fact. See *Butz v. Glover Livestock Commission Co., Inc.,* 411 U.S. 182, 185–186, 93 S.Ct. 1455, 1457, 36 L.Ed.2d 142; *Valdak,* 73 F.3d at 1470. The Commission's decision clearly reflects consideration of the statutory criteria and a careful review of the facts of the case. The penalty imposed by the Commission appropriately reflected the statutory criteria and was supported by the record.

The order of the Commission is AFFIRMED.