In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2492

SIERRA RESOURCES, INCORPORATED,

Petitioner,

v.

ALEXIS M. HERMAN,

Respondent.

On Petition for Review of an Order
of the Occupational Safety and Health Review
Commission.
OSHRC No. 98-0758--Irving Sommer, Chief Judge.

ARGUED FEBRUARY 10, 2000--DECIDED MAY 30,
2000

   Before COFFEY, FLAUM and DIANE P. WOOD,
Circuit Judges.

   COFFEY, Circuit Judge.  After
Occupational Safety and Health
Administration (OSHA) inspector, Tim
Gainer, visited the Blue Island,
Illinois, work site of Sierra Resources,
Incorporated, Sierra was issued a nine-
item "serious citation"/1 alleging
violations of the OSHA standards dealing
with lead exposure in construction
work./2 In a thorough analysis, the
Chief Judge for the Occupational Safety
and Health Review Commission
(Commission), relying primarily on
credibility determinations, upheld the
nine-item citation. In this borderline
frivolous appeal, Sierra seeks review of
the Commission's order, arguing that: 1)
the OSHA inspector violated its due
process rights; and 2) the order is not
supported by substantial evidence. We
deny Sierra's petition for review.
I.  BACKGROUND

   Sierra is a small construction company
located in Batavia, Illinois, and is in
the business of installing and repairing
structural steel. From February 3, 1998,

to March 26, 1998, Sierra was a subcontractor on a project to renovate the Western Avenue Bridge in Blue Island, Illinois.

On February 5, 1998, OSHA received an anonymous telephone complaint that Sierra's employees working on the Western Avenue bridge were being overexposed to lead (in the paint on the bridge) and, furthermore, that they were not being supplied with adequate protective equipment. The following day, OSHA sent one of its compliance officers, Tim Gainer, to inspect Sierra's work site.

Upon Gainer's arrival at the work site, he met with Sierra's vice president, Robert Sutphen, and advised him of the complaint that OSHA received and that he was on the site to conduct an inspection. Although no employees were doing bridge work that day, Sutphen informed Gainer that Ed Hawkinson and Gary Orszulak had been descaling rust from bolts on the bearing assemblies and cutting the bolts with a torch in order that the assemblies could be removed and replaced. Gainer then asked Sutphen whether there was any lead on the bridge, and Sutphen responded that there was a "minimal" amount. The OSHA inspector next inquired if any air monitoring of the employees' work area had been performed, and Sutphen replied that he had not done any at this site but that he had seen testing at a similar site and what he was doing was "okay." Unpersuaded by Sutphen's assurances that everything was "okay," Gainer asked if there would be any more torch cutting performed that day because he was interested in monitoring the air quality within the employees' breathing area while they were cutting the rusted bolts; Sutphen responded in the negative but promised to advise OSHA the next time such work was about to be performed. Before leaving, Gainer took a sample of paint from where the bridge work had been previously completed./3

Despite Sutphen's assurances that he would contact OSHA the next time Sierra employees were engaging in torch cutting, Gainer did not hear from him. After being unable to reach Sutphen on February 10, 1998 (four days after Gainer first arrived at the site), Gainer went back to the site unannounced on Friday, February 13, and observed Hawkinson and Orszulak

working on the bridge without respirators. He told Sutphen that he wanted to do some "sampling" but was informed that it would not be a good day to do so because for the remainder of the day the employees would only be doing "prep work" and no more torch cutting. The OSHA inspector informed Sierra that he would be back the next day and did so, this time fitting sampling pumps on Hawkinson and Orszulak./4

Gainer spent the remaining part of the day observing the two men, as well as reviewing Sierra's lead program Sutphen had given him. The inspector noted that only Orszulak wore a respirator (both should have been), that both employees wore street clothes (while they should have been wearing protective overalls), and that the necessary clothes-changing and hand-washing facilities were no place to be found. When Gainer questioned Sutphen about these problems, Sutphen repeated that the work was being done safely and that he had the test results to prove it; however, even though Gainer requested the test results on each of the five visits he made to the site, Sutphen never provided them.

On March 17, 1998, Gainer received the test results from the air sampling pumps which revealed that Orszulak had been exposed to lead in excess of the permissible limit and also that Hawkinson's exposure exceeded the action level./5 The OSHA inspector telephoned Orszulak on March 19, 1998, to give him the results and ask him if he had ever had any training in lead safety; Orszulak responded in the negative. On March 20, Gainer returned to Sierra's job site and observed Orszulak torch cutting and another employee, Frank Mulcrone, descaling; both employees were wearing respirators and overalls, but the overalls had rips and tears in them and the feet in the overalls were cut off. Gainer interviewed Mulcrone who informed him that he had never received any training in the use of respirators nor had he participated in any lead safety programs./6 The OSHA inspector met with Sutphen and noted the poor and tattered condition of the employees' overalls and, once again, inquired about a change area and a hand-washing facility. Sutphen responded that a change area was neither feasible nor needed, and that employees

could use a bucket to clean up; Gainer looked into the bucket Sutphen had pointed to and discovered it was empty. While at the site, Gainer also met with Craig Satalic, the business agent for the employees' union. Satalic informed the inspector that he had visited the Sierra job site on numerous occasions and asked for respirators, overalls, blood tests, and change and wash facilities; however, on each occasion the request was denied by Sutphen.

On March 23, 1998, Gainer held a "closing conference"/7 with Sutphen to discuss the nine violations of 29 C.F.R. sec. 1926.62. Ten days later, on April 2, 1998, pursuant to its authority under 29 U.S.C. sec. 658(a), OHSA charged Sierra with the nine violations that Gainer had observed.

Sierra appealed this nine-item citation to the Commission, but the Administrative Law Judge (ALJ), relying primarily on credibility determinations, affirmed the citation and assessed a penalty of $2100 for item one (the failure to ensure that its employees were not over exposed to lead) and a penalty of $750 for each of items two through nine, for a total of $8100. Sierra petitions for review.

II. ANALYSIS

In a review of enforcement actions by OSHA, we will affirm the agency's legal determinations as long as these are not arbitrary or capricious and are in accordance with law. Caterpillar, Inc. v. Occupational Safety and Health Review Comm'n, 122 F.3d 437, 439-40 (7th Cir. 1997); 5 U.S.C. sec. 706. We defer to the agency's reasonable interpretations of its own regulations. In re Establishment Inspection of Caterpillar, Inc., 55 F.3d 334, 336 (7th Cir. 1995). We affirm findings of fact if supported by substantial evidence. Caterpillar, 122 F.3d at 440 . . . . The ALJ's credibility determinations must be honored by a reviewing court unless these determinations are contradicted by "uncontrovertible [documentary or physical] evidence." Faultless Division, Bliss & Laughlin Industries, Inc. v. Secretary of Labor, 674 F.2d 1177, 1182 (7th Cir. 1982) . . . .

Union Tank Car Co. v. Occupational Safety

& Health, 192 F.3d 701, 705 (7th Cir. 1999); see also Martin v. Pav-Saver Manufacturing Co., 933 F.2d 528, 530-32 (7th Cir. 1991).

A.  Sierra's Due Process Claims

Sierra contends that its due process rights were violated because Sutphen: 1) was not given a copy of the complaint which was the basis for Gainer's inspection; 2) did not have the opportunity to accompany Gainer as he performed the walk-around portion of the inspection; and 3) was excluded from Gainer's interviews with employees Hawkinson and Orszulak.

However, Sierra's argument seems to assume that for every statutory or regulatory violation of a procedural nature there must necessarily be a due process violation at a Constitutional level, a contention that is without any basis in the law. See Paul v. Davis, 424 U.S. 693, 700-01 (1976); United States v. Knottnerus, 139 F.3d 558, 561 n.5 (7th Cir. 1998) (citing United States v. Caceres, 440 U.S. 741, 749-52 (1979); Bridges v. Wixon, 326 U.S. 135, 152-53 (1945); Yang v. INS, 109 F.3d 1185, 1195 (7th Cir. 1997)). Despite Sierra's allegations that the OSHA inspector failed to follow the statutory and regulatory requirements concerning notice, it is clear that when Gainer first arrived on the site he informed Sutphen that he was an OSHA inspector and that he was on the premises to conduct an investigation. It is also clear that Sierra had an opportunity to defend itself against the subsequent nine-item citation OSHA issued. The fact that Sierra does not agree with the ALJ's decision and argues that statutory and regulatory requirements regarding notice were technically violated falls short of giving rise to a due process violation.

The Due Process Clause of the United States Constitution requires that Sierra be given notice and an opportunity to respond. Contrary to Sierra's arguments, these requirements were clearly met in this case. Because Sierra has failed to point us to any support for its Constitutional claim, nor have we found any upon review, we decline to address this issue any further. See Knottnerus, 139 F.3d at 561 n.5 ("An agency's failure

to follow its own regulations does not rise to the level of a constitutional violation unless the regulations themselves are compelled by the Constitution.").

B.  The Nine Violations in the Citation

Sierra next baldly contends that it did not violate any of the lead safety standards with which it was charged in OSHA's nine-item citation. However, after briefing and a hearing in which testimony was received from numerous individuals, the ALJ based his conclusions on credibility determinations; the ALJ credited the testimony of Gainer, Sierra's employees, and their union business agent, and discredited Sutphen's testimony./8 In contending that it did not violate OSHA regulations, Sierra is asking this court to substitute our own credibility determinations for that of the ALJ, something we decline to do. See Jet Star, Inc. v. NLRB, 209 F.3d 671, 676 (7th Cir. 2000) ("We must affirm credibility determinations made by the ALJ, and adopted by the Board, in the absence of extraordinary circumstances. . . . Such extraordinary circumstances include a clear showing of bias by the ALJ, an utter disregard for uncontroverted sworn testimony or the acceptance of testimony which on its face is incredible." (internal quotations omitted)); see also United States v. Mancillas, 183 F.3d 682, 710 n.22 (7th Cir. 1999) ("We do not second-guess the [ALJ]'s credibility determinations because he or she has had the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.").

Sierra's petition for review is

DENIED.

/1 OHSA issues "serious violations" for those conditions which create "a substantial

probability of death or serious physical harm." 29 U.S.C. sec. 666(k).

/2 Specifically, the citation charged Sierra with: 1) failing to assure that its employees were not overexposed to lead; 2) failing to determine its employees' lead exposure level at the start of the project; 3) failing to provide its employees with appropriate respiratory protection; 4) failing to provide its employees with appropriate protective work clothing; 5) failing to provide its employees with a clean change area; 6) failing to provide its employees with adequate hand-washing facilities; 7) failing to provide its employees with blood sampling for lead levels; 8) failing to provide its employees with safety training; and 9) failing to establish and implement a written lead safety/compliance program.

/3 Tests revealed that the lead content in the paint was 50%.

/4 According to Gainer's testimony, the sampling pump is a small device that is affixed to an employee's waist and a filter runs up into the employee's breathing area. The device then measures the air contaminants to which the employee is exposed.

/5 The lead standard's permissible exposure level and action level are 50 and 30 micrograms per cubic meter of air (ug/m3), respectively. See 29 C.F.R. 1926.62(b). The parties stipulated that the air monitoring results showed Orszulak's exposure to be 119.7 ug/m3 and Hawkinson's exposure level to be 43.4 ug/m3.

/6 Gainer obtained authorization from Mulcrone, Orszulak, and Hawkinson (who had, for reasons unexplained in the record, been fired from Sierra) to review their most recent blood tests for lead. According to the blood tests, Hawkinson's, Orszulak's, and Mulcrone's blood lead levels were 50.5, 23.9, and 7.5 micrograms per deciliter of blood (ug/dl), respectively. According to 29 C.F.R. sec.sec. 1926.62(c)(1) and (k), Hawkinson should have been removed from the work site for medical reasons once his blood lead level reached 50 ug/dl.

/7 Cf. 29 C.F.R. sec. 1903.7(e) ("At the conclusion of an inspection, the Compliance Safety and Health Officer shall confer with the employer or his representative and informally advise him of any apparent safety or health violations disclosed by the inspection.").

/8 For example, when the ALJ discussed his reasons for finding that Sierra failed to ensure that its

employees were not overexposed to lead, he stated, "I observed the demeanors of the witnesses and found the testimony of [Gainer], Orszulak and Satalic convincing and credible. The testimony of Sutphen on the other hand, in addition to being contrary to that of the other witnesses, was simply unpersuasive." Additionally, when discussing Sutphen's failure to provide OSHA with test results, the ALJ stated, "Sierra failed to offer the results in support of its position, and Sutphen's testimony about his misplacing the results and his inability to secure another copy from the company that had them was unconvincing."