# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3697

LAKELAND ENTERPRISES OF
RHINELANDER, INCORPORATED,

*Petitioner*,

v.

ELAINE L. CHAO, Secretary of Labor,

*Respondent.*

_____

Petition for Review of an Order
of the Department of Labor.
No. 02 CB 1909

_____

ARGUED OCTOBER 26, 2004—DECIDED MARCH 28, 2005

_____

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This is a review of a decision of the Occupational Safety and Health Review Commission (OSHRC) assessing a $49,000 civil penalty against Lakeland Enterprises of Rhinelander, Inc., for willful violation of 29 C.F.R. § 1926.652(a)(1), which requires that workers in excavation trenches be protected from cave-ins. Lakeland argues that the evidence collected at its excavation site should have been suppressed because the surprise inspec-

tion by a compliance officer from the Occupational Safety and Health Administration (OSHA) was conducted without a warrant. Lakeland also challenges the administrative law judge's (ALJ) exclusion of certain expert testimony and attacks the sufficiency of the evidence regarding the code violation and the ALJ's finding of willfulness. We deny the petition for review.

## I.  Background

Lakeland is a northern Wisconsin sewer and water contractor. In August 2002 the company was engaged in an excavation project to install sewer and water lines on a public street in the Mill Creek Industrial Park development in Marshfield, Wisconsin. The citation at issue here arose from an August 28 impromptu inspection conducted by Chad Greenwood, an OSHA compliance officer who was driving by the industrial park project and noticed the excavation in progress. Greenwood parked his car, walked past some traffic cones blocking street traffic from the site, and observed Lakeland employee Ron Krueger excavating a trench with a backhoe. Greenwood also observed another Lakeland employee, Tony Noth, working at the bottom of the trench. The trench contained neither a ladder nor a trench box, a device used to prop up the walls and prevent collapse.

Greenwood began videotaping the scene, at which point Jim Gust, the project superintendent, asked him to step back and informed him that the road was closed. Greenwood explained that he was an OSHA compliance officer and indicated the nature of the inspection.[1] While Gust and

---

[1]  29 C.F.R. § 1903.7(a) instructs as follows: "At the beginning of an inspection, Compliance Safety and Health Officers shall present their credentials to the owner, operator, or agent in charge at the establishment; explain the nature and purpose of the
(continued...)

Greenwood were speaking, Noth began climbing up one of the walls of the trench. Greenwood observed loose dirt falling back into the trench, apparently unsettled by Noth's feet as he scaled the slope. Krueger later admitted that he knew Noth was not supposed to be working in the trench and that he failed to remove him. After Noth climbed out of the trench, Krueger told him he should not have been working in the trench without a trench box. Krueger then resumed the excavation.

The slope of the trench walls concerned Greenwood. Sloping is "a method of protecting employees from cave-ins by excavating to form sides of an excavation that are inclined away from the excavation so as to prevent cave-ins." 29 C.F.R. § 1926.650(b). Eyeballing the trench, Greenwood believed the walls were too steep and there was a fair chance they could collapse. Greenwood measured the slope of the trench walls and recorded a west wall slope of 35 degrees, an east wall slope of 50 degrees, a north wall slope of 38 degrees, and a south wall slope of 49 degrees.[2] After Greenwood left, Lakeland employees measured the trench wall slopes and produced a different result for the south wall only: Lakeland's measurement found the south wall to be sloped at 45 degrees.

Greenwood also measured the length and width of the trench at the surface and found that it was approximately 31 feet wide, east to west, and 39 feet long. However, because Krueger had widened the trench in the process of

---

[1] (...continued)
inspection; and indicate generally the scope of the inspection and the records specified in § 1903.3 which they wish to review."

[2] Greenwood's testimony at the administrative hearing attributes a 48-degree slope to the south wall, and this discrepancy between his report and his testimony is unexplained. The discrepancy does not matter, however; both a 48-degree slope and a 49-degree slope are too steep for the soil type. *See* pp. 11-13, *infra.*

"grooming" it after Noth climbed out, the 31-foot-width measurement overstated the width of the trench at the time Noth was in it. Greenwood testified the "grooming" process added about 5 feet to the width of the trench. Lakeland contended the trench was actually 34 feet wide and 38 feet long. There is no dispute the trench was approximately 18 feet deep and 6 feet wide at the bottom.

In addition to his other measurements, Greenwood also took soil samples. Not all soil is the same, and different types of soil will behave differently under the pressure of holding up a trench wall. *See Globe Contractors, Inc. v. Herman*, 132 F.3d 367, 369 (7th Cir. 1997). For instance, a trench dug in firm clay will hold up better than a trench dug in loose, sandy soil. In addition to the composition of the soil, several other factors contribute to soil's relative stability, including water saturation levels, fissures, and previous digging in the soil. OSHA recognizes such soil differences by classifying soil into several categories. Type A soil is the most stable, followed by Types B and C. OSHA regulations allow trenches dug in Type A soil to be sloped up to 53 degrees (¾ horizontal to 1 vertical); walls dug in Type B soil may be sloped no steeper than 45 degrees (1 horizontal to 1 vertical), and in Type C soil no steeper than 34 degrees (1½ horizonal to 1 vertical). *See* 29 C.F.R. § 1926, subpt. P, app. B.

Greenwood's soil samples came from a "spoil pile"—a pile of soil that had been removed from the trench. His field tests found the soil was Type B. He also sent two soil samples to an OSHA lab, which classified one sample as Type B and the other as Type C. After Greenwood left the site, Krueger took his own soil samples and sent them to a private engineering firm, STS Consultants; the firm classified the soil as Type A. Later, when the trench had been filled in, STS took on-site samples which it determined to be both Type A and B soil.

Based on the soil samples and Greenwood's measurements of both the soil quality and the trench dimensions, OSHA's

office in Madison, Wisconsin, issued three citations to Lakeland, including the citation at issue on this review—willfully permitting an employee to work in a trench without adequate protection (inadequately sloped trench walls), in violation of 29 C.F.R. § 1926.652(a)(1).[3] Lakeland timely contested the citations, *see* 29 U.S.C. § 659(c), and an ALJ conducted a two-day evidentiary hearing. Lakeland moved to suppress the evidence from the inspection, asserting that Greenwood's search of the excavation site violated the Fourth Amendment because it was conducted without a warrant. The ALJ denied the motion, concluding that Lakeland had no right of privacy on the excavation site because "that land and that road was [a] public road that they [Lakeland] did not own," and further that "it was covered by the open fields doctrine." The ALJ also concluded that any Fourth Amendment claim was waived because Lakeland did not object to the inspection and ask for a warrant at the site.

On the merits, Lakeland disputed both the soil type and the dimensions and slope of the trench, and also maintained that any violation of 29 C.F.R. § 1926.652(a)(1) was not willful because it had a safety program in place and had attempted to comply in good faith with the applicable regulations. Greenwood testified for the Secretary of Labor. The Secretary also called three expert witnesses: two OSHA soil analysts and an OSHA engineer. Krueger, Gust, and Lakeland President Gary Taylor testified for Lakeland. The company also presented the testimony of Thomas O'Neill,

---

[3] The code provision states as follows: "Each employee shall be protected from cave-ins by an adequate protective system designed in accordance with paragraph (b) or (c) of this section." 29 C.F.R. § 1926.652(a)(1). Subsection (b) prescribes requirements for trench sloping systems, and subsection (c) prescribes requirements for other protective devices such as shield systems (trench boxes).

a soil engineer at STS Consultants; Harry Butler, a safety consultant; and a union operating engineer familiar with Lakeland's jobsites. The ALJ affirmed all three citations and held that the trench wall violation was willful.

The ALJ rejected the testimony of Krueger, Gust, and Taylor as "neither credible nor plausible," and accepted the Secretary's evidence regarding soil type and trench dimensions over the evidence produced by Lakeland's tests and measurements. The ALJ found the on-site testing done by Lakeland after the inspection was nothing more than a "post-facto reconstruction of the facts," and concluded that Greenwood's measurements and soil tests, which were contemporaneous with the alleged violation, more accurately reflected both the trench's dimensions and its soil classification. The ALJ also held Lakeland's violation of the trench wall safety regulation was willful because: (1) Greenwood's videotape depicted "a deep, dangerous trench with steep sides, with visibly running soil"; (2) Krueger and Gust were trained supervisory personnel with "years of trenching experience" and were aware of Noth's improper presence in the trench; and (3) Lakeland had a history of trenching citations. The ALJ assessed a penalty of $49,000. Lakeland petitioned for discretionary review by the Occupational Safety and Health Review Commission. Review was declined, the ALJ's decision became the final order of the Commission, and Lakeland sought review in this court. *See* 29 U.S.C. §§ 659(c), 660(a), 661(j).

## II. Discussion

### A. Fourth Amendment

Lakeland argues that Greenwood's warrantless inspection violated the Fourth Amendment and that the evidence seized in the inspection should have been suppressed. The ALJ denied Lakeland's suppression motion, concluding that Lakeland had no right of privacy on a jobsite on a public

roadway and that the excavation site was covered by the "open fields" doctrine. The ALJ also found waiver because Lakeland did not object to the inspection and ask for a warrant at the scene.

As a threshold matter, it is an open question in this circuit whether the exclusionary rule applies to OSHA civil enforcement proceedings. *Donovan v. Fed. Clearing Die Casting Co.*, 695 F.2d 1020, 1023 (7th Cir. 1982) (applying a good faith exception without directly deciding the applicability of the exclusionary rule). In *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984), the Supreme Court held that the exclusionary rule does not apply to civil deportation actions. The Court applied the framework established in *United States v. Janis*, 428 U.S. 433 (1976), for determining the applicability of the exclusionary rule in noncriminal contexts. The Court initially noted that it had "never applied [the exclusionary rule] to exclude evidence from a civil proceeding, federal or state." *Lopez-Mendoza*, 468 U.S. at 1041-42 (quoting *Janis*, 428 U.S. at 447). The *Janis* framework, reiterated in *Lopez-Mendoza*, requires courts to "weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs" of suppression. *Lopez-Mendoza*, 468 U.S. at 1041 (citing *Janis*, 428 U.S. at 446).

The Court in *Lopez-Mendoza* limited its inquiry on the "benefit side of the balance" to the exclusionary rule's primary purpose of deterring Fourth Amendment violations, because "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.' " *Id.* (quoting *Janis*, 428 U.S. at 446). On the "cost side of the balance" the Court focused on the "loss of often probative evidence and all the secondary costs that flow from the less accurate or more cumbersome adjudication" that results from suppression. *Id.*

The Court considered the deterrence value of applying the exclusionary rule in deportation cases to be only marginal, because "the INS has already taken sensible and reasonable

steps to deter Fourth Amendment violations by its officers." *Lopez-Mendoza*, 468 U.S. at 1050. On the other hand, the Court considered the costs of applying the exclusionary rule in the deportation context to be "high" because suppression would overburden immigration judges, result in the loss of reliable evidence and "oversuppression" of evidence lawfully obtained, and "would compel the courts to release from custody persons who would then immediately resume their commission of a crime through their continuing, unlawful presence in this country." *Id.* at 1048-50.

The Court noted that "[a]pplying the exclusionary rule in proceedings that are intended not to punish past transgressions but to prevent their continuance or renewal would require the courts to close their eyes to ongoing violations of the law." *Id.* at 1046. Employing an example with potential relevance in the OSHA enforcement context, the Court said: "[p]resumably no one would argue that the exclusionary rule should be invoked to prevent an agency from ordering corrective action at a leaking hazardous waste dump if the evidence underlying the order had been improperly obtained." *Id.* The Court concluded that "the *Janis* balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS." *Id.* at 1050.

The Fifth and Sixth Circuits have applied *Lopez-Mendoza* in the context of OSHA civil enforcement proceedings and have drawn a distinction between proceedings to order corrective action against unsafe working conditions and proceedings to assess monetary penalties against employers for past OSHA violations. In *Smith Steel Casting Co. v. Brock*, 800 F.2d 1329, 1334 (5th Cir. 1986), the Fifth Circuit held that the exclusionary rule is not applicable in OSHA proceedings that seek to terminate or remediate occupational health and safety violations. The court also held, however, that "the exclusionary rule applies where the object is to assess penalties against the employer for past violations of

OSHA regulations." *Id.* In *Trinity Industries, Inc. v. OSHRC*, 16 F.3d 1455, 1462 (6th Cir. 1994), the Sixth Circuit followed *Smith Steel* and held that the exclusionary rule applies to OSHA penalty proceedings.

We need not decide here whether to join the Fifth and Sixth Circuits in distinguishing between corrective and punitive OSHA proceedings for purposes of the applicability of the exclusionary rule. Lakeland loses even if the rule applies in this context. The excavation site in question was a public street, not Lakeland's private property; there is no reasonable expectation of privacy in an open trench dug on a public roadway. *See L.R. Willson & Sons, Inc. v. OSHRC*, 134 F.3d 1235, 1238-39 (4th Cir. 1998) (no reasonable expectation of privacy on construction jobsite easily observable by passersby); *Donovan v. A.A. Beiro Const. Co., Inc.*, 746 F.2d 894 (D.C. Cir. 1984) (no expectation of privacy in construction areas open to plain view by the public); *Marshall v. Western Waterproofing Co., Inc.*, 560 F.2d 947, 951 (8th Cir. 1977) (no reasonable expectation of privacy in construction site scaffolding readily observable by public); *Accu-Namic, Inc. v. OSHRC*, 515 F.2d 828, 833 (5th Cir. 1975), *cert. denied*, 425 U.S. 903 (1976) (no violation of construction contractor's Fourth Amendment rights because trench inspection occurred on public street).

Moreover, the ALJ correctly concluded that any Fourth Amendment objection was waived because Lakeland did not object to Greenwood's inspection and request a warrant at the scene. The evidence indicates that although Gust initially told Greenwood that the road was closed, when Greenwood identified himself as an OSHA compliance officer and announced the reason for his presence, Lakeland employees acquiesced and cooperated in the inspection. Although perhaps more properly characterized as consent rather than waiver, the ALJ's conclusion that Lakeland waived any Fourth Amendment objection to the inspection is consistent with case law in this circuit. *See Kropp Forge*

*Co. v. Sec'y of Labor*, 657 F.2d 119, 122 (7th Cir. 1981) ("Since Kropp's representatives were present at all times during those inspections and did not raise any objections when informed of the intended sampling, any Fourth Amendment objection to those surveys was waived.").

## B. The Violation

On the merits, Lakeland challenges the sufficiency of the evidence to support the ALJ's findings on the trenching violation, and also contends the ALJ erroneously prohibited one of its experts from testifying about the physical characteristics of the trench. The ALJ's factual findings are conclusive if supported by substantial evidence in the record considered as a whole. *Sierra Resources, Inc. v. Herman*, 213 F.3d 989, 992 (7th Cir. 2000). Credibility determinations are not overturned unless contradicted by incontrovertible evidence. *Id.* (citing *Faultless Div., Bliss & Laughlin Indus., Inc. v. Sec'y of Labor*, 674 F.2d 1177, 1182 (7th Cir. 1982)). The ALJ's evidentiary decisions are reviewed for abuse of discretion. *Freeman United Coal Min. Co. v. Benefits Review Bd., U.S. Dept. of Labor*, 909 F.2d 193, 196 (7th Cir. 1990) (ALJ has broad discretion in the admission of evidence).

Taking Lakeland's arguments in reverse, we cannot see how the ALJ's limitation on the expert's testimony was reversible error. Harry Butler, Lakeland's safety consultant, testified about his safety consulting work at Lakeland and his experiences at other Lakeland jobsites. When his direct examination turned to the jobsite in question in this case, counsel for the Secretary objected to two questions: one asking whether the soil at the trench site had been previously disturbed, and the other asking the witness about the north-south position of the trench on the excavation site, by reference to a photographic exhibit. Each objection was based on the expert's lack of personal knowledge, his

testimony having previously established that he had never actually seen the trench but only reviewed the documentary record of the citations.

Lakeland argues Butler should have been permitted to answer these questions because an expert need not have personal knowledge about the facts upon which he bases his opinion. *See* Fed. R. Evid. 703; *Nutrasweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 789 (7th Cir. 2000); *see also* 29 C.F.R. § 2200.71 (Federal Rules of Evidence are applicable in OSHRC proceedings); *DCS Sanitation Management, Inc. v. Occupational Safety & Health Review Comm'n*, 82 F.3d 812, 814-15 (8th Cir. 1996). This is correct, but immaterial on this review. The questions to which objections were sustained asked about facts that were testified to by other witnesses. The expert's answers would have been cumulative, so no harm was done in excluding them. The ALJ did not categorically exclude Butler's *opinion* testimony. Lakeland's counsel did not follow up by asking Butler to render an opinion about the safety of the trench based on facts in the documentary record or testified to by other witnesses; it appears that the entire line of questioning was simply dropped. Any evidentiary error was harmless.

As to the sufficiency of the evidence of the code violation, Lakeland acknowledges the deferential standard of review but invites us to take what amounts to a fresh look at the evidence. As it did before the ALJ, Lakeland argues here about the soil classification and the adequacy of the trench wall slopes. With respect to the soil classification, Lakeland would have us substitute its soil samples and test results for OSHA's. The ALJ accepted Greenwood's soil samples as more accurately reflecting the soil composition at the time of Noth's exposure in the trench. The ALJ's reasons for preferring OSHA's samples over Lakeland's are not suspect: Greenwood's samples came from an undisturbed pile of soil that had been removed from the trench, while Lakeland's samples were collected later, after Krueger finished groom-

ing the excavation, and also included borings taken outside the immediate area of the trench and thus appeared to the ALJ to be "calculated to mislead."

In addition, the ALJ found that Lakeland's soil test results did not comport with the visual evidence of the excavation. The judge's written decision notes that "Greenwood's videotape show[s] a steep excavation made entirely in loose sandy soil." Given two competing analyses of soil classification, the ALJ was entitled to credit OSHA's over Lakeland's, and his reasons for doing so are supported by the record. The ALJ's finding of fact that the trench soil was a mixture of Type B and Type C is supported by substantial evidence.

As to the slope of the trench, Lakeland takes issue with Greenwood's measurement of the trench's south wall slope. Greenwood testified the south wall slope was 48 degrees, a measurement he arrived at by using an engineering rod and a protractor. Type B soil requires a slope no steeper than 45 degrees (1 horizontal to 1 vertical), and Type C soil requires a slope no steeper than 34 degrees (1½ horizontal to 1 vertical). Lakeland calculated the south wall slope at 45 degrees. The company argues that its measurement was more reliable than Greenwood's because it is difficult for one person using an engineering rod and protractor to get an accurate measurement, and the company used three employees to take its measurement.

Lakeland also contests the width and length of the trench. Greenwood testified that the trench was 31 feet wide and 39 feet long; this measurement was taken after Krueger had completed "grooming" the excavation, which added 5 feet to the trench's width. Lakeland contends the trench was 34 feet wide and 38 feet long. The parties agree that the trench was 6 feet wide at the bottom and 18 feet deep.

Lakeland's argument about the inaccuracy of Greenwood's rod-and-protractor measurement misses the mark, because

the ALJ relied upon the evidence of the trench's length, width, and depth to determine the slope violation. The judge noted that in Type B soil an 18-foot-deep trench, 6 feet wide at the bottom, would have to be at least 42 feet long to comply with the Type B soil requirement of wall slopes no greater than 45 degrees (1 horizontal to 1 vertical or 18 + 6 + 18). Anything less than 42 feet would involve at least one wall sloped too steeply. For a trench in Type C soil, the ALJ observed, a 60-foot length would be necessary to maintain the required trench slope of 34 degrees (1½ horizontal to 1 vertical or 27 + 6 + 27). Accordingly, the ALJ held, accepting either Lakeland's measurements of the length and width of the trench or Greenwood's, the walls were too steep for the regulatory standard. At either 38 or 39 feet long, the trench fell short of the 42-foot length that would be required for Type B soil and the 60-foot length required for Type C soil.

Furthermore, regardless of the dispute over the slope of the south wall, the parties agreed that the east wall of the trench was sloped at 50 degrees, well in excess of the required 45 degrees for Type B soil and 34 degrees for Type C soil. Having rejected Lakeland's contention that the soil was classified as Type A, the undisputed 50-degree slope of the east wall violated the applicable standard. The ALJ's conclusion that Noth was exposed to a cave-in hazard in violation of 29 C.F.R. § 1926.652(a)(1) was supported by substantial evidence.

## C.  Willfulness

Willful OSHA violations can result in fines of up to $70,000. *See* 29 U.S.C. § 666(a). "An OSHA violation is willful if it is committed with intentional disregard of, or plain indifference to, the requirements of the statute." *Caterpillar, Inc. v. OSHRC*, 122 F.3d 437, 440 (7th Cir. 1997) (citing *Valdak Corp. v. OSHRC*, 73 F.3d 1466, 1468

(8th Cir. 1996)). We review the ALJ's fact-finding on the issue of willfulness under the substantial evidence rule; the ALJ's decision on willfulness will be sustained if it is not arbitrary and capricious and is in accordance with the law. *Id.*

The ALJ found willfulness here largely because Noth was working in the inadequately sloped trench in plain view of two Lakeland supervisors—Krueger and Gust. Krueger never told Noth to get out of the trench, although upon Noth's exit Krueger warned him that he should not have been in it without a trench box in place. There was evidence that Noth was in the trench to protect a sewer line from breaking during the excavation. The ALJ concluded that "[a]t worst Gust and Krueger expected or encouraged Noth to enter the trench to protect the pipe from breakage; at best they acquiesced to Noth's presence in the trench." In *Globe Contractors*, we held that ignoring obvious violations of OSHA safety standards amounts to "plain indifference" for purposes of a finding of willfulness. *Globe Contractors*, 132 F.3d at 373. It is undisputed that Lakeland supervisors knew Noth was in the trench without adequate protection from cave-in and did nothing to eliminate the obvious danger or remove him from the trench. That, in itself, constitutes plain indifference to the requirements of the statute and regulations.

But there was more to the ALJ's willfulness finding—it was also based on Lakeland's history of OSHA citations. Greenwood testified Lakeland had received six OSHA citations since 1990, including one for a trench-related fatality in 1996. Lakeland disputes the number of citations, asserting that some were dismissed and one was settled. Lakeland concedes at least three prior citations, however, including the one relating to the trenching fatality. The ALJ concluded Lakeland's citation history demonstrated that the contractor possessed a "heightened awareness" of its responsibility to comply with OSHA safety regulations, thus

providing further support for a finding of willfulness. This conclusion cannot be characterized as arbitrary and capricious. The ALJ's willfulness finding was supported by substantial evidence, was consistent with applicable law, and was not arbitrary and capricious.

For the foregoing reasons, the petition for review is DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*