In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 14-3156

DUKANE PRECAST, INC.,

*Petitioner,*

*v.*

THOMAS E. PEREZ, Secretary of Labor, and the OCCUPATIONAL
SAFETY AND HEALTH ADMINISTRATION,

*Respondents.*

———————————

Petition for Review of an Order of the
Occupational Safety & Health Review Commission.
No. 1:12-1646.

·———————————

ARGUED APRIL 2, 2015 — DECIDED MAY 4, 2015

———————————

Before BAUER, POSNER, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* The petitioner, Dukane, manufactures concrete building products in a plant in Naperville, Illinois, a suburb of Chicago. At the time of the accident that gave rise to this case (February 2012), the plant had 50 employees. The accident occurred in a bin, some ten feet in width at the top and tapering to a cone shape at the bottom (eighteen feet down), for storing sand. The accident victim

was a worker named William Ortiz. While he was standing in the bin trying to scrape sand from its inside wall, the sand beneath his feet gave way, causing him to sink and to be engulfed by sand flowing into the space created by his fall. Buried up to his neck in the sand he screamed, and several workers, hearing his screams, ran to the bin and began trying to dig him out. They were able to remove the sand pressing on him above his waist but not the sand pressing on the lower part of his body, so he remained trapped.

The plant's manager, Don MacKenzie, was told about the accident within about 10 minutes after it happened; a supervisor had found out about it by asking where all the workers were and he informed MacKenzie, who arrived at the bin a few minutes later. He decided there was no emergency—that Ortiz was in no danger—and, told by the attempting rescuers that they thought they could dig Ortiz out, left the accident scene. The would-be rescuers, though well intentioned and indeed courageous—for they could have been engulfed by the sand as well—were not trained or equipped to rescue a person trapped in a bin of sand, and their efforts at digging away the sand pressing on Ortiz created a space for other loose sand to press in on him, impeding their rescue efforts. He asked them to call 911 to summon professional assistance, but for unexplained reasons no one did. Eventually, however, MacKenzie was told by an employee of Ortiz's wish, and upon asking the employee whether he was confident that the workers who were trying to rescue Ortiz would succeed, and receiving an answer that must have been less than reassuring, MacKenzie called 911. The Naperville Fire Department's Technical Rescue Team, which has specialized training and equipment for dealing with accidents of the kind that befell Ortiz, arrived within a few

minutes. By this time Ortiz had been trapped in the bin for an hour and a half.

We would have liked the parties to tell us exactly how long it took for the rescue team to arrive, because the longer it was expected to take, the stronger the excuse for letting Ortiz's coworkers try to save him despite the danger to themselves. We have discovered on our own, however, that it was the Technical Rescue Team at Fire Station #1 that was summoned. See Naperville Fire Department, 2012 Annual Report 15, www.naperville.il.us/emplibrary/NFDAnnualRep ort2012.pdf (visited on May 1, 2015). Google Maps tells us that it's about a 3.3 mile drive from Station #1 to the Dukane plant and takes only about 6 minutes if there is no traffic—fewer surely for an emergency vehicle that can ignore speed limits and run through red lights.

Using a vacuum truck (a tank truck equipped with a powerful suction pump) to remove the sand in which Ortiz was trapped, the rescue team (with help from firefighters from other fire stations in or near Naperville) was able to remove him from the bin—though it took between three and a half and four hours. Ortiz had thus been trapped in the sand for more than five hours before he was rescued. He sustained serious injuries to his lower body from being squeezed by a large mass of sand for such a long time. For a detailed description of the accident and rescue, see "Man Trapped in Cement Auger at Dukane Precast," CHICAGO FIREMAP.NET, Oct. 9, 2012, www.chicagofiremap.net/2012/ 10/man-trapped-in-cement-auger-at-dukane.html (also visited on May 1).

The bin that Ortiz had entered is, in OSHA-speak, a PRCS, which is an acronym for "permit-required confined

space." OSHA requires that a facility that has such spaces "develop and implement procedures for summoning rescue and emergency services, for rescuing entrants from permit spaces, for providing necessary emergency services to rescued employees, and for preventing unauthorized personnel from attempting a rescue." 29 C.F.R. § 1910.146(d)(9). The facility's rescue plan must specify that in the event of an accident, rescue and emergency services are to be summoned immediately, and must forbid anyone not employed by those services to attempt a rescue. Another OSHA regulation requires the posting of danger signs on the bins, such as DANGER–PERMIT–REQUIRED CONFINED SPACE, DO NOT ENTER. 29 C.F.R. § 1910.146(c)(2). Also mandatory is a protective railing or other barrier around the bin, which must be at least 42 inches high and warn of "dangerous equipment" and "similar hazards." 29 C.F.R. §§ 1910.23(c)(3), (e)(1).

An OSHA inspector examined the bin and other relevant portions of Dukane's plant the day after the accident and on the basis of the inspection the agency cited Dukane for three "serious" violations of OSHA regulations and one "willful" one. See 29 U.S.C. §§ 666(a), (b), (k). The serious violations were that the barrier, which consisted of the bin's wall, was only 27 inches above the platform abutting the wall; that Dukane had failed to take measures to prevent unauthorized entry into the bin (and also into another bin—the Dukane plant has five bins altogether); and that the company had failed to post warnings that a permit was required to enter a bin. The "willful" violation was Dukane's failure to summon emergency services (that is, the fire department) immediately upon discovering the accident, and to prevent Ortiz's coworkers from trying to rescue him, which they were for-

bidden to do because of the danger to themselves and be-
cause they might also endanger the person they were trying
to rescue.

OSHA proposed, and an administrative law judge of the
agency imposed, a penalty on Dukane of $70,000 for the four
violations. The company's petition for review challenges the
finding of the willful violation and the finding of one of the
serious violations—the violation of the requirement of a 42-
inch railing or equivalent barrier.

Regarding the willful violation Dukane argues that the
applicable regulation, 29 C.F.R. § 1910.146(d)(9), doesn't re-
quire that the employer actually call 911 immediately or
prevent coworkers from attempting a rescue, but requires
merely that it have adopted such procedures. The regulation
instructs the employer to "develop and implement" the pro-
cedures, and Dukane argues that to develop is to devise and
that to implement is to adopt rather than to apply. That may
be a permissible *literal* interpretation, but it is neither inevi-
table nor sensible, as it would allow the employer to do
nothing at all to rescue a worker injured or endangered at
work—not even call 911. Literalism frequently, and in this
instance, leads to absurd results.

A more difficult question is whether the violation of the
regulation was "willful." The term is not defined in the stat-
ute or in a regulation; and in the common law, to which one
might look for guidance, it has no standard definition. Often
bracketed with "wanton" or "malicious" (which is no help at
all, as these terms too have no standard definition in the
law), willfulness can be a synonym for recklessness or de-
note a heightened form of negligence, similar to gross negli-
gence and thus falling short of recklessness. See, e.g., *Night-*

*ingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958 (7th Cir. 2010); *Fagocki v. Algonquin/Lake-In-The-Hills Fire Protection District*, 496 F.3d 623 (7th Cir. 2007); *Wassell v. Adams*, 865 F.2d 849, 853–54 (7th Cir. 1989).

We may have muddied the waters by saying in *Lakeland Enterprises of Rhinelander, Inc. v. Chao*, 402 F.3d 739, 747 (7th Cir. 2005), that "an OSHA violation is willful if it is committed with intentional disregard of, or plain indifference to, the requirements of the statute." See also *Globe Contractors, Inc. v. Herman*, 132 F.3d 367, 372–73 (7th Cir. 1997); *Caterpillar Inc. v. OSHRC*, 122 F.3d 437, 440 (7th Cir. 1997). (Other courts have used similar formulas. See Ann K. Wooster, "What Constitutes 'Willful' Violation for Purposes of §§ 17(a) or (e) of Occupational Safety and Health Act of 1970," 161 A.L.R. Fed. 561 (2000).) The first alternative in this test (intentional disregard) corresponds to recklessness: you know there's a danger, you could prevent it, but you do nothing. (In contrast, negligence requires only that there be a danger of which a reasonable person would be aware, not that the particular defendant, who may not be a reasonable person, have been aware of it.) But OSHA based its determination that Dukane's violation had been willful on the second formula—"plain indifference"—and it's unclear what that term means. The *Lakeland* decision says that "ignoring obvious violations of OSHA safety standards amounts to 'plain indifference.'" *Lakeland Enterprises of Rhinelander, Inc. v. Chao, supra*, 402 F.3d at 747–78. But that sounds either like negligence (if "ignore" can just mean "doesn't notice"), or like recklessness (the violation was obvious to you, meaning that you knew it without having to conduct an investigation, but you decided to do nothing about it). It therefore duplicates the first alternative in the *Lakeland* test.

We tried to clarify the meaning of willfulness in *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014), where we said that

> to act "willfully" is, for purposes of civil law, to engage in conduct that creates "an unjustifiably high risk of harm that is either known or so obvious that it should be known," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)—reckless conduct, in other words, as held in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56–60 (2007), but reckless conduct in the civil sense. Criminal recklessness is generally held to require "knowledge of a serious risk to another person, coupled with failure to avert the risk though it could easily have been averted, … whereas in civil cases at common law it is enough that the risk, besides being serious and eminently avoidable, is obvious; it need not be known to the defendant." *Slade v. Board of School Directors*, 702 F.3d 1027, 1029 (7th Cir.2012).

Our attempt at clarification may not have been entirely successful. To ignore a risk that is "obvious" to a reasonable person but not to the particular defendant is to be negligent, not reckless, though the formula "either known or so obvious that it should be known" was from the Supreme Court's decision in *Farmer v. Brennan*, rather than our own invention. Further complicating the analysis, in *United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998), we had said that a "serious" violation of the Occupational Safety and Health Act or its regulations is a violation caused by negligence, while a willful violation for which 29 U.S.C. § 666(e) decrees imposition of criminal penalties if the violation causes death requires proof not only that the risk was known to the defendant but also that he knew he was violating the

law. *Id*. at 487–90; *United States v. L.E. Myers Co.*, 562 F.3d 845, 853 (7th Cir. 2009). And this formula also appears in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 n. 9 (2007) But proof of willfulness in 29 U.S.C. § 666(a)—the subsection that is at issue in this case and provides just for civil penalties—requires proof only that the defendant was aware of the risk, knew that it was serious, and knew that he could take effective measures to avoid it, but did not—in short, that he was reckless in the most commonly understood sense of the word. See *AJP Construction, Inc. v. Secretary of Labor*, 357 F.3d 70, 74 (D.C. Cir. 2004); *Valdak Corp. v. OSHRC*, 73 F.3d 1466, 1468–69 (8th Cir. 1996).

There is no doubt that MacKenzie acted recklessly and therefore willfully within the meaning of section 666(a) and that his reckless behavior must be imputed to Dukane (Dukane doesn't contest the second proposition). As plant manager he had to know that the bins were permit-required confined spaces (he testified that he didn't know, but the administrative law judge disbelieved him, as she was entitled to do), yet if he didn't, he had at least to know that Ortiz was in danger, for when he arrived at the scene Ortiz was buried up to his waist in the sand. MacKenzie testified that he didn't realize that Ortiz was in any danger, but again the administrative law judge disbelieved his testimony.

The plant's safety director, Tom Gorman, was the author of the plant's OSHA-required plan for dealing with emergencies in permit-required confined spaces. He believed he had instructed MacKenzie about the plan but couldn't recall when. It may have been years before the accident and in the interim MacKenzie may have forgotten. Or maybe, since there were no signs designating the bins as PRCS, he didn't

realize that the bins were permit-required confined spaces to which the plan therefore applied. But the potential danger to worker safety posed by these huge bins must have been obvious to him, and likewise his duty as plant manager to take charge of the response to any emergency. His ignorance of safety procedures, if indeed he was ignorant of them rather than determined to ignore them, was itself willful. For he had to know that there was a risk of accidents and that if he hadn't a clue to how to respond the consequences could be disastrous.

MacKenzie wasn't the only Dukane employee who disregarded the regulation. Gorman, although he had coordinated with local fire departments regarding rescue procedures in 2002 and 2004, had trained Dukane employees in groups before 2007, and afterward had conducted individual training of employees who were to enter permit-required confined spaces, testified that of the employees involved in the accident only Ortiz and MacKenzie had received PRCS training. Yet the training records reveal that two of the workers who participated in the attempt to rescue Ortiz had also received confined-space training. There is no evidence that the workers who had received such training communicated what they had learned to workers who hadn't.

The railing regulation that Dukane was held to have violated (one of the "serious" violations, as distinct from the "willful" violation, that it challenges) states that "regardless of height, open-sided floors, walkways, platforms, or runways above or adjacent to dangerous equipment, pickling or galvanizing tanks, degreasing units, and similar hazards shall be guarded with a standard railing and toe board." 29 C.F.R. § 1910.23(c)(3). And a standard railing is, as noted ear-

lier, required to be at least 42 inches in height, § 1910.23(e)(1), in order "to prevent falls of persons." § 1910.21(a)(6). Dukane's arguments that it didn't violate these regulations are terrible. One argument is that a sand bin is not as dangerous as a galvanizing tank, which contains lethal liquids, such as liquid zinc. And that's true; it isn't *as* dangerous. But a fall into an eighteen-foot-deep sand bin is a good deal more dangerous than a short fall onto regular flooring, as indicated by the serious injuries that Ortiz sustained. No more is required to trigger the requirement of a 42-inch guardrail (or its equivalent). Dukane's further argument that the danger is "*de minimis*" (misspelled in Dukane's brief as "*de minimus*") is refuted by Ortiz's accident—had he dropped a few inches deeper into the sand he would have been asphyxiated by it. The fact that OSHA's regulations make special provision for assuring safety in permit-required confined spaces is a further indication that they are indeed dangerous.

The company's final argument is that the platform next to the bin was not "open-sided," because of its 27-inch wall. If accepted, the argument would gut the regulation, for the logic of the argument is that an inch-high railing would, by making the failed area no longer "open-sided," excuse the employer from compliance with the guardrail regulations.

The petition for review is

DENIED.