In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3809

STARK EXCAVATING, INC.,

*Petitioner,*

*v.*

THOMAS E. PEREZ, Secretary of Labor,

*Respondent.*

On Petition for Review of an Order of
the Occupational Safety and Health Review Commission
OSHC-1:09-0004

ARGUED SEPTEMBER 24, 2015 — DECIDED JANUARY 29, 2016

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Stark Excavating, Inc. ("Stark"), an excavation and paving company that typically handles about 250 jobs per year throughout central and southern Illinois, was issued a number of citations at two different worksites in June, 2008, following inspections by the Occupational Safety and Health Administration (OSHA). On June 5, 2008, an OSHA inspector issued three citations to Stark relating to its Peoria,

Illinois, worksite for a serious eyewear violation under 29 C.F.R. § 1926.102(a)(2), a willful excavation cave-in protection violation under 29 C.F.R. § 1926.652(a)(1), and a repeat excavation spoil piles violation under 29 C.F.R. § 1926.651(j)(2). Seventeen days later, on June 22, another OSHA inspection, at a Stark worksite in Champaign, Illinois, resulted in a citation for a willful excavation cave-in protection violation under 29 C.F.R. § 1926.652(a)(1). The Secretary proposed penalties of $2000 for the eyewear violation, $35,000 for the spoil piles violation, and $70,000 each for the cave-in protections violations.

Stark contested the citations, which were consolidated for hearing before an Administrative Law Judge (ALJ). After a trial, the ALJ affirmed the citation for the eyewear violation and the $2000 penalty, affirmed the spoil piles violation and awarded a $20,000 penalty, and determined that the cave-in protection violations were serious violations rather than willful violations and imposed a $7,000 penalty for each of those violations, for a total penalty of $36,000.

Both parties appealed the ALJ's decision to the Occupational Safety and Health Review Commission ("Commission"). The Commission affirmed the ALJ's determination as to the spoil piles violation and the serious cave-in protection violation at the Champaign, Illinois, worksite and vacated the eyewear violation. As to the Peoria cave-in protection violation, the Commission determined that it should be characterized as willful rather than serious and assessed a penalty of $60,000 for that violation, for a total penalty of $87,000. Stark now appeals only the issuance of the citation for a willful excavation cave-in protection violation under 29 C.F.R. § 1926.652(a)(1) at its

Peoria worksite. Stark asserts that the Commission erred in characterizing the violation as willful rather than serious, and that it engaged in a good faith effort to comply with the regulation.

Section 1926.652(a)(1) provides that "[e]ach employee in an excavation shall be protected from cave-ins by an adequate protective system designed in accordance with paragraph (b) or (c) of this section." Different types of soil pose different risks under the pressure of holding up a trench wall. *Lakeland Enterprises of Rhinelander, Inc. v. Chao*, 402 F.3d 739, 742 (7th Cir. 2005). For instance, a trench dug in firm clay will pose different problems than one dug in loose, sandy soil, and other factors such as water saturation levels, fissures, and previous displacement of the soil will also contribute to the soil's relative stability. *Id.* The soil type is classified depending upon its characteristics into several categories, with Type A constituting the most stable type followed by Type B and Type C. *Id.* Excavation risks may be mitigated in various ways such as through sloping, the use of benched grades, or the use of a trench box. Where sloping is the protective measure used, the soil type determines the slope required for safety such that Type A soil can be sloped up to 53 degrees, Type B may be no steeper than 45 degrees, and Type C cannot exceed 34 degrees. *Id.*; 29 C.F.R. § 1926, subpt. P, app. B.

At the Peoria worksite on the day of the citation, Stark's crew was replacing a leaking underground fire hydrant waterline in an excavation in front of a Starbucks coffee house. That task involved removing an existing fire hydrant, installing a new one, and backfilling the area. Foreman Jason Schupp was the supervisor of the crew at the site that day and arrived at

approximately 7:00 a.m. The task was estimated to require half a day, but Schupp testified that he wanted to complete the job quickly in the hope that it would result in future business from the developer. At that time, Schupp obtained a soil sample from the excavation site and analyzed it with his penetrometer. He recorded the soil type as Type B on the Daily Report, which is a report he had used every day in the time period before the inspection. On that Daily Report, Schupp would record the soil type and then determine what type of cave-in protection to use, whether sloping, benching, or the use of a trench box. The soil type was recorded by checking boxes on the top half of the Daily Report form, and the bottom half of that page had boxes to check indicating the method of protection used. That bottom portion provided that for Type B soil, if sloping is the means of protection, then the maximum allowable slope was 45 degrees. Although Schupp completed the top half of the form, he did not fill out the bottom half and did not take any action to determine whether the excavation met the 45 degree slope requirement. He testified that he "did not pay attention really how the hole looked" stating "I looked at it. I knew it was—I just wanted to get in there and get the hydrant on is really the bottom line." Laborer Matt Bohm entered the excavation by ladder and Schupp, from a vantage point at the top edge of the hole, observed him working there for approximately 10 minutes. At that time, OSHA Compliance Safety and Health Officer Karl Armstrong approached the worksite. Armstrong spoke with Schupp upon his arrival and Schupp declared that once he realized OSHA was on-site it "kind of hit home with me like my hole, I'm sure it's not sloped right, I didn't take the time to go ahead and do my practices. …"

The petitioner does not contest that the slope of the excavation was not in compliance with the regulation. Armstrong measured the slope at various areas of the wall, and determined the slope of those areas to be 60, 70, 76 and 80 degrees. All of those slopes indisputably exceeded the permissible slope of 45 degrees. Accordingly, Stark concedes that the regulations were violated in that the excavation site failed to comply with 29 C.F.R. § 1926, but argued that the non-compliance should be characterized as serious rather than willful and that it engaged in a good faith effort to comply with the regulations.

Pursuant to 29 U.S.C. § 666(k), a violation is "serious" if there is a substantial probability that death or serious physical harm could result from the violative condition. Stark does not contest that the violation in this case arose at least to the level of serious, but challenges the characterization of the violation as willful. In *Dukane Precast, Inc. v. Perez*, 785 F.3d 252, 256 (7th Cir. 2015), we held that "proof of willfulness … requires proof only that the defendant was aware of the risk, knew that it was serious, and knew that he could take effective measures to avoid it, but did not—in short, that he was reckless in the most commonly understood sense of the word."[1]

---

[1] In *Dukane*, we distinguished this standard from the one applicable under 29 U.S.C. § 666(e) which decrees imposition of criminal penalties. In that context, to be deemed "willful," a violation must have been committed knowingly, that is, with awareness of the essential facts and legal requirements. *Id.*; *United States v. L.E. Myers Co.*, 562 F.3d 845, 853 (7th Cir. 2009). We have held that the willfulness requirement in that provision requires actual knowledge, which "'may be proved by showing deliberate indiffer-

(continued...)

The citation issued to Stark regarding the Peoria site cave-in protection characterized the violation as willful. The ALJ first determined that Foreman Schupp's direct knowledge of Bohm's work activity in the excavation was imputed to Stark and Stark does not challenge that here. The ALJ then concluded, however, that the violation was serious but not willful. First, the ALJ noted that Stark had developed a well-documented excavation safety program with adequate rules and employee training which did not support a determination that if informed of a duty to act it would not have cared. The ALJ further held that the evidence did not rise to the level of intentional, knowing or voluntary disregard for the Act or plain indifference to employee safety. As support for that determination, the ALJ stated that the record demonstrated "a reasonable effort by the Respondent to slope the excavation as opposed to not taking any steps at all to slope the walls." ALJ Op. at 10-11. That statement by the ALJ is unsupported in the record. There is no indication that Schupp, or anyone else affiliated with Stark, took any action to slope the excavation so as to comply with the requirements of the Act, and the measurements of the walls, which are drastically non-compliant, reflect that failure. Therefore, the ALJ erred in relying on that factor in determining that the violation was not willful. The remaining factors set forth by the ALJ are unhelpful. The ALJ

---

[1] (...continued)

ence to the facts or the law … or by showing awareness of a significant risk coupled with steps to avoid additional information … .'" *Id.*, quoting *United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998). The Commission's findings would support a determination of willfulness under either standard.

noted Schupp's testimony that he did not know whether the sloping was in compliance with the regulations, and distinguished that situation from one in which a supervisor measured the angles, determined that the wall was non-compliant, and proceeded without rectifying the situation. Based on that distinction, the ALJ was unconvinced that the evidence rose to the level of willfulness. In so holding, the ALJ also pointed to Schupp's testimony that he "usually get[s] into trouble because [he] take[s] too much time making sure that ditches are correct." The ALJ identified that statement as support for a finding that Schupp's conduct reflected inaction due to negligence rather than willfulness. Later in the opinion, however, the ALJ identified the same statement as reflecting an "unsavory conundrum for Respondent's supervisors—risking trouble for taking the time to properly implement safety measures, or, risking trouble for *not* taking the time to properly implement safety measures." ALJ Op at 15. That "unsavory conundrum" noted by the ALJ encompassed two intentional responses by supervisors—one of which sacrificed time for safety compliance and the other which sacrificed safety compliance for time savings. Interpreted in that context, Schupp's statement would reflect a willful determination to forgo the safety practices in order to save time.

On appeal, the Commission agreed with the ALJ that the foreman, Schupp, and thus Stark, had a heightened awareness of the requirements of the cited OSHA provision, which is uncontested by Stark on appeal. It concluded, however, that the record supported the Secretary's contention that the foreman "deliberately disregarded" those requirements. The Commission noted Schupp's testimony that at the start of work

that day he determined that the excavation contained Type B soil and recorded that information in the Daily Report. Printed on the report itself is the requirement that if sloping is the means of protection utilized then the slope for an excavation with Type B soil is 45 degrees. Therefore, as a person who filled out such reports on a daily basis including that morning when he recorded the Type B determination, Schupp was aware that the excavation walls at that site could not be sloped more than 45 degrees without violating safety requirements.

The Commission then concluded that although Schupp testified that he was in a hurry and was not paying attention, the evidence showed that he knew or at least deliberately avoided knowing that the slopes of the east and west walls exceeded 45 degrees by a wide margin. First, the Commission noted that there was no support for the ALJ's contention that the record demonstrated reasonable efforts by Stark to slope the excavation. The Commission then noted that although Schupp completed the top portion of the report indicating the soil type, he did not complete the lower portion pertaining to cave-in protection. It then concluded that "[h]aving classified the soil type and recorded it on the Daily Report, we find it incredible that the foreman could have failed to observe the marked discrepancies between the slopes that actually existed — up to 80 degrees — and the 45-degree slopes that the foreman knew were required for this particular excavation. Under these circumstances, we find that the foreman either knew the slopes of the excavation walls exceeded 45 degrees, or deliberately avoided this knowledge in his admitted haste to complete the work." Comm'n op at 21-22.

On appeal, Stark argues that the ALJ, not the Commission, was able to observe the demeanor of Schupp in assessing credibility, and that its determination that the conduct was not willful was based upon that credibility determination. Citing *Super Excavators, Inc. v. Occupational Safety and Health Review Comm'n*, 674 F.2d 592, 594 (7th Cir. 1981), and *Union Tank Car Co., Inc. v. Occupational Safety and Health Admin.*, 192 F.3d 701 (7th Cir. 1999), Stark argues that an ALJ's credibility determinations must be honored by a reviewing court unless those determinations are contradicted by incontrovertible documentary or physical evidence. It asserts that we therefore must defer to the ALJ's credibility determination as to Schupp. There are myriad problems with this argument, but the most glaring is that in those cited cases we were reviewing the ALJ's determination, not the Commission's decision, because the Commission had declined to exert its discretionary review in those cases. *Super Excavators*, 674 F.2d at 593, *Union Tank Car*, 192 F.3d at 704. Neither of those cases presented us with the question as to what our role is when reviewing the decision of the Commission.

We have, however, addressed that precise question in other cases. We have noted that "[w]here the Commission reverses an ALJ, it is the Commission's order alone that is reviewed." *Chao v. Gunite Corp.*, 442 F.3d 550, 556 (7th Cir. 2006). We will uphold the Commission's findings of facts if supported by substantial evidence on the record considered as a whole. *Id.* at 557; 29 U.S.C. § 660(a). "'Substantial' in this context 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *KS Energy Services, LLC v.*

*Solis*, 703 F.3d 367, 371 (7th Cir. 2012), quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Moreover, "[o]ur deference to the Commission includes deference to its credibility determinations, except in extraordinary circumstances." *Chao*, 442 F.3d at 557; *Estrada-Martinez v. Lynch*, ___ F.3d ___, 2015 WL 9584833 at *6 n.4 (7th Cir. Dec. 31, 2015)(the OSHA Board "is not bound by fact and credibility determinations made by an administrative law judge, although those determinations are entitled to 'some weight,' and there must be substantial evidence for rejecting them."); *Allis-Chalmers Corp. v. Occupational Safety & Health Review Comm'n*, 542 F.2d 27, 30 (7th Cir. 1976)("the Commission was not bound by these credibility determinations [of the ALJ], as long as its findings are supported by substantial evidence."); *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317, 322 n. 6 (5th Cir. 1984)("[t]he Commission is not bound by the ALJ's credibility determinations").

Stark argues that the ALJ is in the unique position to determine credibility because only the ALJ had the opportunity to observe the demeanor of the witness. That is a relevant consideration for the Commission to consider in assessing whether to affirm the credibility finding of the ALJ. Moreover, in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951), the Court noted that in reviewing whether the substantial evidence standard is met when a Board and its examiner disagree, "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of

testimony." In the present case, the ALJ's decision was not consistent and its determination was improbable in light of the objective evidence. Substantial evidence in the record supported the Commission's determination.

As was noted above, the ALJ based his conclusion in part on the erroneous belief that the record demonstrated a reasonable effort by the Respondent to slope the excavation as opposed to not taking any steps at all to slope the walls. The Commission properly noted that the ALJ's finding was unsupported in the record, and that alone provides a proper basis for the Commission to reject the subsequent conclusions. Moreover, the ALJ characterized Schupp's statement that he "usually get[s] in trouble because [he] take[s] too much time making sure the ditches are correct" as evidence that his failure to implement safety measures was due to negligence not willfulness, but also pointed to that same statement as evidence that supervisors faced the "unsavory conundrum" of either performing the safety measures and risking trouble from Stark for taking too much time or failing to perform the safety measures and risking trouble from OSHA – both of which evidence intentional conduct. The statement by Schupp, even if credited, could support a determination that he therefore chose not to make sure the ditches were correct because he admittedly wanted to complete the project more quickly. See *Local 65-B Graphic Communications Conference of the Intl. Brotherhood of Teamsters v. NLRB*, 572 F.3d 342, 349 (7th Cir. 2009)(the difference of opinion between the ALJ and the Commission was not whether to credit certain testimony, but what conclusion to draw from the same piece of testimony).

Therefore, the Commission was presented with an ALJ determination that was based on an assumption unsupported in the record and on evidence deemed capable of contradictory interpretations. Its determination that the ALJ erred in characterizing the violation as serious rather than willful is supported by substantial evidence in the record, and is consistent with the initial characterization made in the original citation. The evidence indicated that on a daily basis in the weeks preceding the violation, Schupp filled out the Daily Report. On the date of the violation, however, he filled out only the top portion of the sheet, determining that the soil was Type B. The bottom portion of the form provided that the maximum slope for type B soil was 45 degrees, but Schupp failed to fill out that portion indicating what methods of protection he was using including proper sloping. Schupp's action in determining the soil type but then ignoring the slope requirements of the form is evidence of willfulness. In addition, the undisputed evidence in the record was that Schupp stood at the top of the excavation looking into it for at least 10 minutes as a laborer worked in it. The Commission held that given the drastic difference between the 45 degree slope allowable and the 80 degree slope found on at least one wall, Schupp could not have failed to notice that the excavation failed to comply or at least was deliberately avoiding such knowledge. The three walls were at significantly steeper angles than the 45 degree slope allowed with measurements of 60 to 80 degrees—a disparity that would have been readily apparent to a person standing, as Schupp was, at the top of the trench and looking into it for 10 minutes. Given Schupp's statement that he wanted to complete the project quickly and that compliance efforts in the past proved

time-consuming, the objective evidence of the failure to fill out the form and the obvious nature of the violation provide ample support for the Commission's determination that the violation was willful.

Stark nevertheless asserts that its good faith efforts to comply with the safety rules negate willfulness. It argues that a company cannot be found to have willfully violated a standard if it exhibited a good faith reasonable belief that its conduct conformed to the law or made a good faith effort to comply with a standard or eliminate a hazard, even though its efforts were not complete, citing *American Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1262 (D.C. Cir. 2003). Stark asserts that it had safety rules in place to ensure that employees were protected from cave-ins, its employees were adequately trained in those requirements, and it conducted regular inspections and otherwise ensured compliance with those rules. Stark points only to general safety rules, however, and not to any actions at this worksite to ensure cave-in protection. That contrasts with the situation in *American Wrecking*, which involved safety measures at the particular site to ensure worker safety but which were different in kind from the measures required by regulation. *Id.* We have held, however, that there is no generic good faith defense for violations of the Occupational Safety and Health Act. *United States v. Ladish Malting Co.*, 135 F.3d 484, 491 (7th Cir. 1998). Good faith efforts to comply with the cave-in protection requirements at this site would of course be relevant to the willfulness issue, but as discussed above there is no evidence of such efforts here.

Moreover, Stark has failed to even present evidence of a good faith effort to ensure compliance with safety rules. The Commission addressed a similar argument by Stark below, in which Stark argued that its extensive safety rules and compliance mechanism established an affirmative defense of unpreventable employee misconduct. As an initial matter, the Commission acknowledged that Stark had established rules to prevent safety violations which were communicated to its employees, and that Stark monitored for compliance with those rules through the actions of its Safety Director, Wayne Clayton, by reviewing daily foreman reports and conducting onsite safety audits. It concluded, however, that Stark failed to demonstrate that it effectively enforced its own rules and policies when violations were discovered. Stark's policy mandated the issuance of written safety tickets with progressive disciplinary consequences for each safety violation, and did not allow verbal warnings to be issued in lieu of those written safety tickets. Under that policy, the first violation should result in the issuance of a ticket and a written warning, the second a ticket and a one-day suspension, the third a ticket and a three-day suspension, and the fourth violation mandated termination. The utilization of written tickets as opposed to verbal warnings would facilitate effective enforcement of the safety rules by allowing the tracking of violations by particular employees especially when working for different foremen. That policy, however, was routinely disregarded. Between August 2006—when the policy was first implemented—and the 2008 inspection at issue here, only 33 tickets had been issued. Of those, six were issued by Stark's area manager in Champaign in September 2006 and the rest were issued by

Stark's safety director Clayton. No other supervisor issued any written tickets between September 2006 and the violation in this case, and Schupp and Ron Martin, a Stark superintendent, testified that they never issued any safety tickets and preferred to verbally correct employees. As to Clayton, testimony also indicated that the supervisors communicated by radio with each other to provide advance warning when Clayton was in the area conducting safety audits. In light of that evidence, the ALJ concluded that Stark failed to demonstrate that it effectively enforced its own rules and policies for safety violations. The Commission affirmed the ALJ's determination that Stark failed to demonstrate effective enforcement, and we agree. Accordingly, Stark failed to demonstrate that it had a safety policy that was effectively enforced during that time, and its argument fails for that reason as well.

The petition for review is DENIED.